AUSA Timothy J. Chapman (312) 353-1925

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION



UNITED STATES OF AMERICA

v.

CHRISTOPHER MIKE GARBOWSKI
also known as "Christopher Michael Garbowski" and "Michael Gunnman"

CASE NUMBER:

**19CR     526**

**UNDER SEAL**

FILED

JUN 2 5 2019

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

MAGISTRATE JUDGE KIM

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about July 28, 2018, at Chicago, in the Northern District of Illinois, Eastern Division, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 33, United States Code, Section 1232 (as in effect prior to December 4, 2018) | willfully and knowingly violating the terms of an Order of the Captain of the Port |

This criminal complaint is based upon these facts:

 X  Continued on the attached sheet.

ASHER THOMAS
Special Agent, United States Coast Guard
Investigative Service

Sworn to before me and signed in my presence.

Date: June 25, 2019

City and state: Chicago, Illinois

*Judge's signature*

YOUNG B. KIM, U.S. Magistrate Judge
*Printed name and Title*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS | SS

## **AFFIDAVIT**

I, ASHER THOMAS, being duly sworn, state as follows:

1.      I am a Special Agent with the United States Coast Guard Investigative Service ("CGIS"), a law enforcement component within the United States Coast Guard ("Coast Guard"), which is within the Department of Homeland Security. I am currently assigned to the CGIS Chicago Resident Agent Office. I have been a Special Agent for approximately nine years. My primary duties and responsibilities as a CGIS Special Agent include the investigation of criminal activity by Coast Guard members subject to the Uniform Code of Military Justice, as well as the investigation of any other criminal activity relating to the maritime jurisdiction or which involve the navigable waters of the United States.

2.      Prior to becoming a Special Agent, I was employed for approximately 10 years by the Coast Guard in other capacities, including service as a Machinery Technician and as a Coast Guard boarding officer, which involved boarding vessels to ensure compliance with maritime laws and regulations. I have received training at both the Federal Law Enforcement Training Center in Glynco, Georgia, and the Coast Guard Training Center in Yorktown, Virginia. During the course of my duties, I have used, and have become familiar with, numerous investigative techniques, including, but not limited to, the following: (a) the collection and review of relevant records (including financial records); (b) physical surveillance; (c) the debriefing of

individuals with relevant information (including informants, witnesses, defendants and others); and (d) the execution of search warrants.

3.     This affidavit is submitted in support of a criminal complaint alleging that Christopher Mike Garbowski ("Garbowski"), also known as "Christopher Michael Garbowski" and "Michael Gunnman," violated Title 33, United States Code, Section 1232 (as in effect prior to December 4, 2018), by willfully and knowingly violating the terms of an Order of the Captain of the Port.

4.     The statements in this affidavit are based on my personal knowledge, my review of records and other evidence gathered to date, information that I have received from other individuals, including other law enforcement personnel, as well as my training and experience and the training and experience of other law enforcement officers. Because this affidavit is being submitted for the limited purpose of establishing probable cause to believe that Garbowski committed the offense charged in the above-described criminal complaint, I have not included each and every fact known to me concerning this investigation.

## I.     SUMMARY

5.     In 2017, I was assigned to an investigation into the unlawful commercial chartering of vessels upon the Chicago area waterway system, primarily Lake Michigan and the Chicago River, both of which are navigable waters of the United States. The commercial chartering of vessels essentially involves the renting of privately owned vessel in exchange for payment, and most often involves the vessel owner, or a person designated by the vessel owner, serving as captain for the duration

of the chartered voyage, which is typically several hours long (*e.g.*, 3-5 hours). As further discussed below, it is unlawful for a person to engage in certain commercial charter operations with a vessel that the Coast Guard has not inspected and certificated as meeting all of the Coast Guard's strict requirements for vessels engaged in commercial operations. It is likewise unlawful for a person to serve as captain of a commercial charter without maintaining a proper Coast Guard credential. It is also a felony criminal offense for any person to violate the terms of any order issued by the Captain of any Port.

6. During the course of this investigation, the Coast Guard determined that Garbowski owned a vessel (hereinafter, the "Subject Vessel") that he has repeatedly used to conduct illegal commercial charter operations. The Subject Vessel is identified presently by the name "Anchorman," although Garbowski has previously operated it under the names "Sea Hawk" and "Manaje III." In particular, during the 2017 and 2018 boating seasons, Garbowski used the Subject Vessel to conduct commercial charter operations on the Chicago area waterway system even though the Subject Vessel had not been inspected and certified as required by federal laws and Coast Guard regulations. Garbowski also served as captain on these charters even though he lacked the proper Coast Guard credential to serve as a captain on such commercial charters. Evidence gathered during the investigation demonstrates that Garbowski was aware that he was operating in violation of Coast Guard regulations and took active steps to conceal his commercial charter activities, including by directing his passengers to lie to the Coast Guard.

7. On August 19, 2017, Coast Guard personnel boarded the Subject Vessel as it was about to begin what was determined by Coast Guard personnel to be an unlawful commercial charter voyage. At that time, Coast Guard personnel served Garbowski with a verbal Captain of the Port Order (known as a "COTP Order") that directed him to cease using the Subject Vessel for commercial charter operations. During an interview that I conducted with Garbowski at that time, Garbowski falsely denied that he was engaged in commercial charter operations.

8. In or about late September 2017, Garbowski falsely represented to the Coast Guard that he had ceased using the Subject Vessel for commercial charter operations. In or about October 2017, as a result of Garbowski's false representations, the Coast Guard rescinded the COTP Order issued on August 19, 2017.

9. During the 2018 boating season, Garbowski continued to engage in unlawful commercial charter operations using the Subject Vessel. On July 27, 2018, I personally served Garbowski with a second COTP Order (in writing) that directed him to cease using the Subject Vessel for commercial charter operations.

10. Evidence gathered during the investigation has established probable cause to believe that, after July 27, 2018, Garbowski has willfully and knowingly violated the second COTP Order by continuing to use the Subject Vessel to conduct commercial charter operations, including on or about July 28, 2018, which was just one day after I served him with the second COTP Order.

## II. RELEVANT STATUTORY AND REGULATORY BACKGROUND

A. Coast Guard Regulations Require the Inspection and Certification of Small Passenger Vessels Used in Commercial Operations.

11.     Title 46 of the United States Code contains statutes related to maritime shipping. Subtitle II to Title 46 contains statutes setting forth the law with respect to vessels and seamen, particularly with respect to commercial vessel operations, which is commonly known as "the merchant marine of the United States." Those statutes generally provide that the Secretary of the Department in which the Coast Guard is located "has general superintendence over the merchant marine of the United States and of merchant marine personnel," and authorize the promulgation of regulations to carry out the provisions of Subtitle II of Chapter 46 of the United States Code. *See* 46 U.S.C. § 2103; 46 U.S.C. § 2101(44).

12.     Title 46, Subtitle II, Chapter 33, pertains to the commercial operation of vessels on the waters of the United States. Chapter 33 provides that the class of vessels subject to inspection by the Coast Guard prior to use in commercial operations includes any "small passenger vessel" 46 U.S.C. § 3301(8). The term "small passenger vessel" is statutorily defined, in relevant part, to encompass any vessel under 100 gross tons[1] "(A) carrying more than 6 passengers, including at least one passenger for hire; (B) that is chartered with the crew provided or specified by the owner or the owner's representative and carrying more than 6 passengers; (C) that is chartered

---

[1] The "gross tonnage" of a vessel is not a measure of the vessel's dead weight on land. Rather, a vessel's gross tonnage is determined through the application of mathematical formulae based upon various physical aspects of the vessel. As discussed below, the Subject Vessel is well below 100 gross tons, thereby qualifying it as a "small passenger vessel" subject to the Coast Guard regulations.

with no crew provided or specified by the owner or the owner's representative and carrying more than 12 passengers; (D) that is a submersible vessel carrying at least one passenger for hire; or (E) that is a ferry carrying more than 6 passengers."[2] 46 U.S.C. § 2101(35) (prior to December 4, 2018); 46 U.S.C. § 2101(45) (after December 4, 2018). Chapter 33 also authorizes the Coast Guard to promulgate regulations to implement its provisions. *See* 46 U.S.C. § 3306. If the inspection verifies that the vessel satisfies all Coast Guard standards, the Coast Guard issues a Certificate of Inspection (commonly known as a "COI") for the vessel. *See* 46 U.S.C. § 3309. In general, it is unlawful for a small passenger vessel subject to inspection to operate without a required COI. *See* 46 U.S.C. § 3311.

13. Pursuant to 46 U.S.C. §§ 2103 and 3306, and other statutory authorities, the Coast Guard promulgated regulations at 46 C.F.R. Chapter I, Subchapter T (Parts 175 through 185), which set forth the inspection and certification requirements for small passenger vessels. The regulations incorporate the statutory definition of "small passenger vessel" and provide that such vessels "may not be operated without having on board a valid Coast Guard Certificate of Inspection." *See* 46 C.F.R. §§ 175.110 and 176.100(a). To obtain a COI, a vessel's owner (or other responsible

---

[2] The term "passenger" excludes various individuals, including the charterer: "In [Title 46, Subtitle II] . . . 'passenger' (A) means an individual carried on the vessel except-- (i) the owner or an individual representative of the owner or, in the case of a vessel under charter, an individual charterer or individual representative of the charterer; (ii) the master; or (iii) a member of the crew engaged in the business of the vessel who has not contributed consideration for carriage and who is paid for on board services . . ." 46 U.S.C. § 2101(21)(A) (prior to December 4, 2018); 46 U.S.C. § 2101(29)(A) (after December 4, 2018).

person) must apply for a COI on a specified Coast Guard form. *See* 46 C.F.R. § 176.105.

14. The vessel inspection is conducted by technically trained and qualified Coast Guard personnel who evaluate the seaworthiness of the vessel for commercial operations. The inspection extends to the vessel's hull, engine and mechanical systems, as well as to the vessel's electrical, lifesaving, fire protection and sanitation systems, among other things. *See* 46 C.F.R. Part 176. In general, and with a few exceptions, a vessel must be dry-docked to facilitate inspection of the vessel's hull. See 46 C.F.R. Part 176, Subpart F. A COI will only be issued if the vessel meets the safety standards specified in Coast Guard regulations. *See* 46 C.F.R. Parts 177 to 185.

15. A person who operates a vessel without a required COI is subject to civil penalties. *See* 46 U.S.C. § 3318.

B. <u>An Individual Engaged in Commercial Charter Operations Using a Small Passenger Vessel Must Hold a Valid Coast Guard Captain's License.</u>

16. Pursuant to 46 U.S.C. § 8902, "[a] small passenger vessel shall be operated by an individual licensed by the Secretary to operate that type of vessel in the particular geographic area, under prescribed regulations."

17. The Coast Guard regulation at 46 C.F.R. § 15.801 provides: "The masters or individuals in command of all vessels, whether required to be inspected under 46 U.S.C. 3301 or not, are responsible for properly manning vessels in accordance with the applicable laws regulations, and international conventions."

18.     Coast Guard regulations at 46 C.F.R. § 15.805 require that the master in command of any inspected small passenger vessel must hold a merchant mariner credential with an endorsement verifying that the individual may serve as a master of the vessel. Such merchant mariner credentials are issued by the Coast Guard. *See* 46 C.F.R. Parts 10 and 11.

19.     An "owner, charterer, managing operator, agent, master, or individual in charge of a vessel" who operates a vessel without a proper Coast Guard license is subject to civil penalties. *See* 46 U.S.C. § 8906.

C.     The Ports and Waterways Safety Act Provided For Criminal Punishment For Violation of a COTP Order.

20.     Prior to December 4, 2018, the Ports and Waterways Safety Act ("PWSA"), codified as Chapter 25 to Title 33 of the United States Code (33 U.S.C. §§ 1221 through 1236), established a statutory and regulatory framework that ensured, among other things, that the commercial operation of vessels on the waters of the United States would be conducted in a manner that ensured the safety of people, vessels, property (both on land and on the water), and the maritime environment.[3] *See* 33 U.S.C. § 1221 (2018). Among other things, the PWSA empowered the Secretary of the Department in which the Coast Guard was operating to order a vessel to "operate or anchor in a manner" as directed by the Secretary if (s)he "has reasonable cause to believe such vessel does not comply with any regulation

---

[3] On December 4, 2018, the Ports and Waterways Safety Act, as amended, was repealed as part of a general statutory recodification pursuant to the Frank LoBiondo Coast Guard Authorization Act of 2018. *See* Public Law 115-282, 132 Stat. 4192. The provisions of the PWSA, except for the policy statement set forth in 33 U.S.C. § 1221 (2018), were generally recodified to Chapter 700 or Title 46, United States Code.

issued under this chapter or any other applicable law or treaty," or "by reason of weather, visibility, sea conditions, port congestion, other hazardous circumstances, or the condition of such vessel, he is satisfied that such directive is justified in the interest of safety." 33 U.S.C. § 1223(b) (2018).

21. As a means to achieve that goal, the PWSA empowered the Coast Guard to promulgate regulations to implement the requirements of the PWSA. *See* 33 U.S.C. § 1231 (2018).

22. Among the regulations promulgated under the PWSA are those codified at 33 C.F.R. Part 160, Subpart B (Control of Vessel and Facility Operations). With some exceptions not pertinent to this case, those regulations apply to any "[v]essel on the navigable waters of the United States." 33 C.F.R. § 106.103. The regulations, at 33 C.F.R. § 106.111, provided for issuance of COTP Orders, in relevant part, as follows:

> Each District Commander or Captain of the Port may order a vessel to operate or anchor in the manner directed when:
>
> > (a) The District Commander or Captain of the Port has reasonable cause to believe that the vessel is not in compliance with any regulation, law or treaty; . . . or
> >
> > (c) The District Commander or Captain of the Port has determined that such order is justified in the interest of safety by reason of weather, visibility, sea conditions, temporary port congestion, other temporary hazardous circumstances, or the condition of the vessel.

23. The PWSA regulations, at 33 C.F.R. § 106.105, further provided that compliance with the COTP Order was mandatory, as follows:

Each person who has notice of the terms of an order issued under this subpart [33 C.F.R. Part 160, Subpart F] must comply with that order.

24.    The PWSA, 33 U.S.C. § 1232(a)(1) (2018), provided: "Any person who willfully and knowingly violates this chapter or any regulation issued hereunder commits a Class D felony.[4]

25.    Thus, any person who willfully and knowingly violated a COTP Order violated a Coast Guard regulation issued under the PWSA (33 C.F.R. § 106.105) and, therefore, committed a felony violation of the PWSA.

26.    For purposes of carrying out its operational duties, the Coast Guard divides the United States into various "Sectors." Coast Guard Sector Lake Michigan is comprised of 21 Coast Guard Stations/Units that are responsible for 1,638 miles of shoreline and approximately 19,000 square miles of surface water. The Area of Responsibility for Sector Lake Michigan covers four states (Wisconsin, Illinois, Indiana, and Michigan) and, in addition to the majority of Lake Michigan, extends to numerous intercoastal waterways, the Chicago River, and 138 miles of the Illinois Des Plaines river system. Coast Guard Sector Lake Michigan is headed by a Captain of the Port located in Milwaukee, Wisconsin. Thus, the Captain of the Port in Milwaukee has jurisdiction to issue COTP Orders to individuals operating on the Chicago area waterway system.

---

[4] I understand that, under 18 U.S.C. § 3559(a)(4), an offense defined as a Class D felony may be punished by a term of imprisonment of up to 10 years' imprisonment.

## III. FACTS ESTABISHING PROBABLE CAUSE THAT GARBOWSKI COMMITTED THE CHARGED OFFENSE

### A. Background Regarding Commercial Charters on the Chicago Area Waterway System

27.     I know from my training and experience, including my work during this investigation, that the Chicago area waterway system is a popular location for people to engage in boating excursions during the warm weather months, usually from approximately May through September. The appeal of these boating excursions during the warm weather months has created a market for the commercial chartering of vessels owned by private individuals or companies. The individuals who charter these vessels do so for a variety of reasons, but common reasons include celebration of a family event (*e.g.*, a wedding anniversary or graduation) and enjoying a social outing with friends (*e.g.*, a birthday party, bachelor or bachelorette party) or coworkers (*e.g.*, a corporate team outing). Tourists and business travelers visiting Chicago may also seek to charter a vessel in order to experience Chicago or participate in the Chicago "boating scene."

28.     Several commercial charter operators conduct business in a lawful manner upon the Chicago area waterway system. These operators conduct charters using vessels that have been inspected by the Coast Guard and for which the Coast Guard has issued a COI because the vessels meet all of the Coast Guard safety standards. These operators also ensure that a properly trained and credentialed vessel master controls the vessel during the charter voyage.

29. Most of the unlawful charter operators identified during the course of the investigation have conducted commercial charters using a private pleasure craft that has not been inspected by the Coast Guard (and, therefore, has not been issued a COI). Often, as in this case, the master of the vessel is also not properly credentialed to serve as master of the vessel during the charter operation.

30. Both lawful and unlawful charters typically last for several hours (usually, 3 to 5 hours) and cost several thousand dollars, depending on the length of the charter, the number of passengers, the services offered (*e.g.*, whether food and drinks are included), and the quality of the vessel used for the charter.

31. There are several areas of the Chicago area waterway system that are particularly attractive to commercial charterers. First, the open waters of Lake Michigan offer the charterers the opportunity cruise the lakefront of Chicago. Second, a very popular destination, generally referred to by the Chicago boating community as the "Playpen," is located north of the Jardine Water Purification Plant (near Navy Pier) and east of Lake Shore Drive but within the breakwater barrier in Lake Michigan. Particularly on warm weekend days, boats enter the Playpen and, given the relatively calm water within the breakwater, often tie up to each other to enable the passengers of the various vessels to socialize with each other. The Playpen is considered the primary "party scene" of the Chicago boating community and is notorious for excessive drinking and reckless behavior.[5] Third, charterers may choose

---

[5] A 2014 article describing the culture of the Playpen party scene may be located at: https://www.chicagoreader.com/chicago/lake-michigan-boat-party-playpen-debauchery-ahoy/Content?oid=14472607

to cruise the Chicago River, from which they can observe the architecture of Chicago and/or moor to a dock in order to participate in the social activities along the Chicago Riverwalk.

32.     Individuals engaged in both lawful and unlawful commercial charters in the Chicago area waterway system, including many of the subjects of this investigation, have advertised their vessels on websites that serve the needs of customers wishing to charter a vessel. Currently, two of the primary websites are Boatsetter (www.boatsetter.com) and Get My Boat (www.getmyboat.com). A third site, called Boatbound, that operated during the course of the investigation has since merged with Boatsetter, which remains active. The companies that own Boatsetter and Get My Boat are based in Florida. During its existence, Boatbound was based in Washington, and Boatsetter continues to employ former Boatbound employees who remain located in Washington. These websites charge vessel owners a fee (usually a percentage of the total charter fee) for use of the website to reserve a charter.

33.     During the course of the investigation, I have served subpoenas for records upon the various companies that operate the boat charter websites. Those records reflected that Garbowski opened a Boatbound account in or about January 2015 that would have allowed him to rent vessels. In or about May 2017, Garbowski's Boatbound account was modified to permit him to offer vessels for rent or charter. However, as discussed below, this latter permission was deactivated on or about July 10, 2017. The records obtained during the investigation reflect that Garbowski has maintained at least five different Get My Boat accounts, the first of which was

opened on or about June 30, 2017 (under the name "Michael Drinkwater"). Four of the accounts, including the first one that he opened, allowed Garbowski to offer vessels for charter. All of Garbowski's Get My Boat accounts appear to be active as of late May 2019 (the last time the government received records).

B.   Background Regarding Garbowski

34.   Garbowski is approximately 33 years old. He presently maintains a valid driver's license (issued in or about October 2018) that identifies him as a resident of Sterling Heights, Michigan. During the course of the investigation, Garbowski presented to Coast Guard personnel a Michigan driver's license (issued on or about September 11, 2017), that identifies him as residing at the same location in Sterling Heights, Michigan. On both of his driver's licenses, his name is presented as Christopher Mike Garbowski.

35.   During an interview with CGIS Special Agents on or about June 24, 2019, Garbowski stated that his real name is Christopher Mike Garbowski, but that he occasionally uses the name "Christopher Michael Garbowski."

36.   A check of Coast Guard records reflects that Garbowski has never held a merchant mariner credential and, therefore, has never held the appropriate license to serve as master of a small passenger vessel engaged in commercial operations.

C.   Background Regarding The Subject Vessel

37.   Pursuant to Coast Guard regulations at 46 C.F.R. Part 67, certain vessels of at least five net tons are required or eligible to obtain a certificate of documentation ("COD") from the Coast Guard. A COD "serves as evidence of vessel

nationality, and permits a vessel to be subject to preferred mortgages." 40 C.F.R. § 67.1. A vessel owner obtains a COD by submitting an application to the Coast Guard's National Vessel Documentation Center ("NVDC"), which issues a unique identifying number for the vessel.[6] This unique identifying number remains the same for the vessel even if the vessel owner later changes the name of the vessel.

38.    Information obtained from the NVDC indicates that the Subject Vessel is registered with the NVDC under Document No. 1192154. NVDC records indicate that the Subject Vessel, under the name "Sea Hawk," was purchased by "GSKI Group LLC" from Owners A1 and A2, both residents of Maryland, on or about June 28, 2017. The vessel is identified as 12 gross tons and having a length of 40 feet, a width of 12 feet, and a fiberglass hull.

39.    Publicly available information accessible online through the Delaware Secretary of State's office identifies GSKI Group, LLC, as a Delaware limited liability corporation that was incorporated on or about July 7, 2017.

40.    On or about July 14, 2017, Garbowski, on behalf of GSKI Group LLC, submitted to the NVDC an application seeking reissuance of the COD for the Subject Vessel. In the application, Garbowski identified the Subject Vessel by the name Manaje III and identified its hailing port as Chicago, Illinois. In the application, the owner is indicated as "GSKI Group, LLC" with a mailing address in Delaware but a

---

[6] Each vessel may be uniquely identified by its unique "hull number," which is issued by the manufacturer of the vessel and stamped into the hull of the vessel. The identifying number issued by the NVDC is not the same as the hull number, but it is associated with the hull number so that the NVDC number only pertains to a single vessel.

physical address in Sterling Heights, Michigan, that was identical to the address listed on Garbowski's then-valid Michigan driver's license. In the application, Garbowski identified himself as the "sole owner" of GSKI Group, LLC. With respect to the Subject Vessel's purpose, Garbowski identified (by checking an adjacent box) the Subject Vessel as intended only for "recreational" use and left blank other fields, as follows:

| J. ENDORSEMENTS FOR WHICH APPLICATION IS MADE | | |
|---|---|---|
| ☑ RECREATIONAL | ☐ COASTWISE – BOWATERS ONLY (CERTIFICATE ON FILE) | |
| ☐ FISHERY | ☐ COASTWISE – OIL SPILL RESPONSE ONLY (LETTER OF QUALIFICATION ON FILE) | |
| ☐ COASTWISE | ☐ COASTWISE UNDER CHARTER TO AN ENTITY QUALIFIED TO ENGAGE IN COASTWISE TRADE | |
| ☐ REGISTRY | (COPY OF CHARTER ON FILE) | |

| K. PRIMARY SERVICE & HORSEPOWER | | |
|---|---|---|
| HORSEPOWER: 620 | | |
| ☐ COMMERCIAL FISHING BOAT | ☐ OFFSHORE SUPPLY VESSEL | ☑ RECREATIONAL |
| ☐ FISH PROCESSING VESSEL | ☐ PASSENGER (6 OR FEWER) | ☐ RESEARCH VESSEL |
| ☐ FREIGHT SHIP | ☐ PASSENGER (MORE THAN 6) | ☐ SCHOOL SHIP |
| ☐ FREIGHT BARGE | ☐ PASSENGER BARGE (6 OR FEWER) | ☐ TANK BARGE |
| ☐ INDUSTRIAL VESSEL | ☐ PASSENGER BARGE (MORE THAN 6) | ☐ TANK SHIP |
| ☐ MOBILE OFFSHORE DRILLING UNIT | ☐ PUBLIC FREIGHT | ☐ TOWING VESSEL |
| ☐ OIL RECOVERY | ☐ PUBLIC TANKSHIP/BARGE | ☐ UNCLASSIFIED VESSEL |
| | ☐ PUBLIC VESSEL, UNC | |

41.     On January 19, 2019, a CGIS special agent interviewed Owner A1 in Maryland. Owner A1 confirmed that Garbowski purchased the Subject Vessel (which was then named Sea Hawk and registered with a hailing port of Washington, D.C.) from Owner A1 on June 28, 2017. Owner A1 presented to the interviewing agent digital photographs of a written sales agreement that Owner A1 took of the purported sales agreement between him and Garbowski for the purchase of the Subject Vessel. In the contract, Garbowski's name and address in Sterling Heights, Michigan, are handwritten onto the agreement as the purchaser, and Owner A1 and his home

address are listed as the seller.[7] Owner A1 also presented to CGIS a digital photograph that he took of Garbowski. From my own interactions with Garbowski, I can identify the individual depicted in the photograph as Garbowski. Owner A1 stated that he took the photograph of Garbowski because Owner A1 deemed it unusual that Garbowski claimed to be unable to produce a driver's license during his interactions with Owner A1.

42. As discussed below, at various times during this investigation, I have personally observed the Subject Vessel. I have observed the vessel underway under the names Sea Hawk (primarily 2017) and Manaje III (primarily 2018). In early June 2019, I received a photograph from a source of information who was able to photograph the back of the Subject Vessel, which was marked with the name "Anchorman." A photograph of the Subject Vessel taken near downtown Chicago on or about July 14, 2018, is set forth below:

---

[7] In the contract, the vessel is described as a 1998 Bayliner Avanti 4085. However, the hull identification number and existing COD number do not match those of the Subject Vessel as registered with the NVDC. In a follow-up telephonic interview on June 11, 2019, Owner A1 clarified that all of the vessels he owns are named "Sea Hawk" and that the hull identification number and the existing COD number listed in the contract correspond with another vessel he owned at the time, and that he (Owner A1) listed those numbers by mistake. Owner A1 further stated that the description of the vessel (1998 Bayliner Avanti 4085) in the contract is a correct description of the vessel he sold to Garbowski.



D.    <u>Evidence Demonstrates That Garbowski Engaged In Commercial Charter Operations Prior To August 19, 2017.</u>

43.    On or about July 15, 2017, the Harbor Master at Monroe Harbor in Chicago reported to the National Response Center that a white vessel with the name Sea Hawk was the suspected source of a release of oil in Monroe Harbor. The Harbor Master also stated that he believed that the Sea Hawk may have been conducting illegal charter boat operations.

44.    During the course of the investigation, investigators have learned that Garbowski maintains accounts with online payment processors PayPal and one of its subsidiaries, Venmo. The government has obtained records from PayPal and Venmo pursuant to subpoenas served upon them. PayPal records reflect that Garbowski is the primary account holder on six PayPal accounts; however, those records also reflect that he primarily has used two of these accounts in relation to his commercial charter activity, namely: (1) a business account under the name "Manaje Productions"

created on or about September 17, 2005;[8] and (2) an individual account under the name "Michael Garbowski" created on or about February 22, 2008. Venmo records reflect that Garbowski opened a single Venmo account under the name "Chris Mike Garbowski" on or about July 28, 2016.

45.     Evidence obtained from individuals during the course of the investigation suggests that Garbowski's standard practice when chartering a vessel was to require a refundable deposit of approximately $500 prior to the charter. After the charter was completed, Garbowski would request payment (often by transmitting an invoice) of the charterer for the full rental amount. After full payment was made, Garbowski then refunded the deposit money.

46.     Records obtained from PayPal/Venmo reflect multiple transactions that are consistent with Garbowski engaging in unlawful commercial charter operations. For example, Venmo records reflect that, in or around July 2017, Individual A paid $1,000 to Garbowski, with an associated note stating "Boat rental part 1." The next day, Individual B paid $1,700 to Garbowski, with an associated note stating "Boat part 2." The next day, Garbowski transferred $500 and $450 via Venmo to Individual A along, with associated notes stating, respectively, "Deposit refund" and "Refund."

47.     Similarly, records from PayPal reflect the following: (a) on or about July 24, 2017, Garbowski transmitted a $517.50 invoice (dated July 30, 2017) to

---

[8] Records from the Michigan Secretary of State reflect that Garbowski created a Michigan corporation called Manaje Productions, LLC, on or about January 26, 2006. The corporate address was the same as Garbowski's Sterling Heights address.

Individual C via PayPal; (b) on or about July 27, 2017, Individual C transferred $517.50 to Garbowski via PayPal; and (c) on or about July 31, 2017, Garbowski transmitted a refund via PayPal of approximately $486 to Individual C.[9]

48. In February 2019, I and another CGIS Special Agent interviewed Individual C. Individual C stated that, in approximately 2016 or 2017, he used the Boatbound website to look for vessels to charter in the Chicago area and made contact with Garbowski.[10] Individual C stated that, upon making contact, Garbowski circumvented the Boatbound application by contracting with Individual C outside of the website.[11] Individual C identified the vessel as named the Manaje III and stated that he chartered the vessel multiple times during 2017 and 2018. For each trip, Garbowski was the captain of the vessel and Individual C was not given a choice of captains. On a couple of occasions, Garbowski also had an additional crewmember.

---

[9] This sequence of transactions supports the inference that the charter voyage likely occurred on or about July 30, 2017.

[10] Get My Boat records reflect that Individual C contacted Garbowski on or about July 24, 2017.

[11] As noted above, the boat rental websites charge a fee (usually a percentage of the charter fee) for each vessel charter arranged using the website. I know from my training and experience, and this investigation in particular, that some vessel owners, in order to avoid the website fee, will use the website to meet a potential customer but then privately contract with the customer outside of the website. Doing this is a violation of the website's terms of service and can result in a vessel owner being removed from the website. As noted above, Garbowski's permission to offer his vessel for rent or charter on the Boatbound website was terminated on or about July 10, 2017. Those records reflect that that permission on Garbowski's account was terminated because Garbowski failed to convert into a sale any of the last 60 charters inquiries he received through the website. Those records reflect that Garbowski had 31 canceled charter bookings, 827 account views, and more than 55 separate charter booking request responses in furtherance of conducing charter voyages. This activity is consistent with the inference that Garbowski used the website to identify and contact potential charterers for his vessel and thereafter circumvented the website to avoid paying the website fees.

Garbowski usually limited the number of passengers at 20-25. Individual C stated that his groups were usually around 15 passengers. Individual C stated that he and his groups always boarded the vessel at Monroe Harbor in Chicago, with the Playpen as their destination. Individual C stated that he paid Garbowski for the charter voyages and that the charter fees included fuel and a captain, but did not include food or alcohol. Individual C stated that he separately provided a tip to Garbowski as well, and that his passengers partially reimbursed him for the cost of the charter. Individual C also stated that, on two of the voyages, the Coast Guard boarded the vessel, apparently to inquire with respect to underage drinking. Individual C also stated that Garbowski instructed him that, if the Coast Guard personnel had any questions, Individual C should direct the Coast Guard member to just inquire of Garbowski. As further discussed below, Individual C also stated that he last chartered the Subject Vessel with Garbowski on July 28, 2018.

49.     Records obtained from PayPal during the investigation indicate that, on or about June 24, 2017, Individual D paid $500 to Garbowski as a deposit for a charter to take place on July 29, 2017. On or about July 20, 2017, Individual D also paid $2,750 to Garbowski for the same charter voyage.

50.     In February 2019, I and another Special Agent interviewed Individual D. During the interview, Individual D stated that, in approximately June 2017, he served (for the only time in his life) as the coordinator for a group of people

who wanted to charter a vessel to attend the Chicago Boat Scene Party.[12] Individual D stated that Garbowski communicated with Individual D via email, and Individual D was able to locate and provide some of those email messages to law enforcement. In those email messages, Garbowski directed Individual D to sign a contract, and offered to provide an altered charter contract so that Individual D could deceive his friends with respect to the cost of the charter if Individual D chose to do so. Email from Garbowski to Individual D includes the following statements with respect to the contract's confidentiality clause:

> But for the confidentiality part, basically it is to not share the details or that it is a charter. If anybody asks, including authorities and harbor, we are friends going out on the lake. [Email of July 20, 2017]

> The most important thing is to let everyone know that I'm your friend and we are all friends. If we are to get stopped by police or coast gaurd [sic], then it could create a problem if anyone says It's a charter, ruining the day. I put the confidentiality clause in the contract for that reason. [Email of July 24, 2017]

According to Individual D, as verified by email messages provided by Individual D, the charter was cancelled due to the poor weather conditions. Individual D stated that he was refunded the full amount for the charter voyage, but only after Garbowski disputed the weather clause of the contract and stated that he (Garbowski) intended to keep one-half of the deposit. Venmo records reflect that, on or about August 10, 2017, Garbowski transferred approximately $2,750 to Individual D with a note that read "7-29 Scene money back."

---

[12] I know from my training and experience that the Chicago Scene Boat Party is an annual event held in the Playpen, usually in late July, that involves an extremely high turnout of participating vessels.

51.     Records from Get My Boat indicated that, on or about August 1, 2017, the website transferred $1,674 to Garbowski via PayPal wire transfer.

52.     Other records from Get My Boat reflect that Garbowski opened his Get My Boat account on or about August 3, 2017. The account information listed an associated address on South Riverside Plaza, Chicago, Illinois, an account name of "Mike Gunnman," and an account payout address to a bank account under the name "Mike Garbowski." The account information also reflected an associated phone number and email address that has been linked by other charter customers and records obtained during the investigation to Garbowski.

53.     On or about August 5, 2017, I conducted surveillance at locations known to be used by individuals engaged in illegal charter operations and observed the Subject Vessel (under the name Sea Hawk) appear to take on fuel at Burnham Harbor with approximately 10 passengers on board, none of whom assisted the operator with fueling or maneuvering operations. This observation was consistent with the Subject Vessel being involved with illegal charter operations.

54.     The evaluation of PayPal/Venmo and Get My Boat records combined with witness interviews has verified that Garbowski used the Subject Vessel to conduct commercial charter voyages on at least August 5, 2017 (reserved by Individual E), and August 10, 2017 (reserved by Individual F). During an interview of Individual F in March 2019, Individual F stated that the captain of the vessel, whom he identified as "Captain Mike," claimed to have obtained a captain's license

online. Such a claim would have been false, insofar as one cannot obtain a Coast Guard captain's license through a private online service.

E.    On August 19, 2017, Garbowski Lied To Coast Guard Personnel And The Coast Guard Issued The First COTP Order.

55.    On the morning of August 19, 2017, I observed the Subject Vessel (under the name Sea Hawk) approach the sewage pump out dock in Monroe Harbor in Chicago, Illinois. I observed Garbowski aboard the Subject Vessel, and I voluntarily assisted Garbowski with mooring the vessel to the dock.[13] A second male was aboard the Subject Vessel at that time. This was the first time that I interacted with Garbowski in person.

56.    After the Subject Vessel was docked, I approached the Subject Vessel to speak with Garbowski. I was wearing clothing that clearly identified me to be a Special Agent, and other Coast Guard personnel in uniform were present on the dock at the time. Later during our conversation, I advised Garbowski of my name and my office. At the start of the interview, I asked Garbowski what his plans were for the day. Garbowski told me that he and his male companion were just waiting for other friends to arrive for a boat ride. Garbowski did not state that he was engaged in a commercial charter operation. I then saw Garbowski appear to use his cellular telephone. Soon thereafter, I witnessed a group of females approaching the dock. I also observed one of those females appear to be using her cellular telephone. The females then boarded the Subject Vessel. Based upon my observations, I then advised

---

[13] It is common for Coast Guard personnel to offer such assistance to boaters.

Marine Safety Unit ("MSU") and other civil Coast Guard law enforcement personnel about my concerns that the Subject Vessel may be involved in an unlawful commercial charter.[14]

57.     Soon thereafter, the MSU personnel decided to board the Subject Vessel At approximately 10:00 a.m. on the morning of August 19, 2017, Coast Guard personnel boarded the Subject Vessel. In accordance with standard protocols, boarding personnel conducted interviews of the occupants of the Subject Vessel in order to ascertain their identities. During that activity, the boarding officers determined that the vessel was being operated by Garbowski and one male crewmember, and that there were a total of eight females on board. During interviews by MSU personnel, some of the females on board the Subject Vessel stated that they had paid money to charter the vessel. As a result, MSU personnel concluded that the Subject Vessel was engaged in an illegal commercial charter. Individual G was one of the individuals aboard the Subject Vessel.

58.     After the Coast Guard boarding team entered onto the Subject Vessel, I and another Coast Guard member interviewed Garbowski on the pier. During the ensuing interview with Garbowski, Garbowski identified himself as a resident of

---

[14] The Coast Guard MSUs are engaged in the civil enforcement of the Coast Guard's laws and regulations. The web page for the MSU in Chicago provides that it is "responsible for executing the Coast Guard's Port Safety and Security, Marine Environmental Protection, and Commercial Vessel Safety missions under the auspices of the Department of Homeland Security." The Coast Guard also maintains "boat stations" on navigable waterways, including on the Chicago area waterway system. The mission of the boat station personnel extends to civil law enforcement, search and rescue operations, and general maritime safety. The MSU offices and the boat stations are not part of the CGIS criminal law enforcement component of the Coast Guard. Rather, they report through a separate chain of command, namely, the Sector Lake Michigan chain of command described above.

Sterling Heights, Michigan. Garbowski repeatedly denied that he was engaged in a charter operation, insisting instead that none of the passengers on the Subject Vessel was paying for the voyage. Garbowski also denied that he had advertised his vessel on any websites or "apps" as a passenger charter vessel, and he continued to deny that he was operating the Subject Vessel for profit or personal gain.

59.   Based upon information from the passengers indicating that, in fact, they had paid for the charter, one of the boarding officers verbally issued a COTP Order to Garbowski. In particular, the boarding officer directed Garbowski to cease using the Subject Vessel for commercial charter operations. The boarding officer then handed to Garbowski a copy of a Boarding Report Form that referenced the regulations at 46 C.F.R. Parts 175-185 and specifically stated: "VESSEL ISSUED COTP ORDER 11-17 TO CEASE COMMERCIAL OPERATIONS." The boarding officers also directed Garbowski to terminate the voyage.

60.   After the voyage was terminated, Garbowski asked me if he could conduct a recreational voyage with his friends. I verbally responded by telling Garbowski that he could operate the vessel recreationally but that it would violate the COTP Order to operate the vessel in a commercial manner.

61.   On September 20, 2017, I conducted an interview of Individual G regarding the August 19, 2017, chartering of the Subject Vessel. Individual G, who is a resident of Missouri, stated that she used the Get My Boat website to charter the Subject Vessel in order to celebrate a birthday and the college graduation of various female friends, some of whom came to Chicago from other states. On the website, the

Subject Vessel was advertised as the "Sea Hawk." She chartered the vessel for $2,400 for a five hour period (10:00 a.m. to 3:00 p.m.). According to Individual G, Garbowski emailed a vessel rental agreement to Individual G that made it appear as if she was going to have to captain the boat.[15] After reading the contract, Individual G pointed out that language to Garbowski and said that she wanted a captain to be provided; in response, Garbowski told her that the language of the contract was not consequential. Individual G also stated that, as she and her friends were walking down the dock to board the Subject Vessel, Garbowski called Individual G on her cell phone and told Individual G to pretend that they were all friends with Garbowski. Individual G did not understand the purpose of that call, but agreed to do so. Individual G stated that, after the Coast Guard terminated her voyage, Individual G complained to Get My Boat and received a full refund, even though Garbowski complained about the refund. Individual G stated that Garbowski contacted her via email and accused Individual G of violating the confidentiality agreement in the contract by talking to the Coast Guard boarding officers. Garbowski also told

---

[15] Individual G did not identify the owner by the name Garbowski, but evidence demonstrates that it was Garbowski (using the name "Mike" and/or "Michael Gunnman") who offered the charter and interacted with Individual G. In addition to the fact that the charter was on the Subject Vessel, Garbowski was present on August 19, 2017, to conduct the charter, and Garbowski's later acknowledgement of owning the Subject Vessel at the time of the boarding (discussed further below.) Individual G provided me with a copy of the charter agreement. That agreement is on letterhead "GSKI Group" and contains nearly identical language to other contracts that Garbowski issued to charter customers. The agreement included the following language: "Renter agrees and acknowledges that he/she will be the sole operator of the boat, and will use the Boat in a careful, safe and conscientious manner. Renter shall at all times observe and adhere to any rules and guidelines posted by Boat Owner, and any applicable laws or regulations. Renter shall be responsible at all time for the safety of any and all passengers in the Boat."

Individual G that he did not think a full refund for the cancelled trip was fair given that Individual G was responsible for the voyage being terminated since she said things to the Coast Guard that, per Garbowski, she should not have said. Individual G terminated her communications with Garbowski and referred him to her lawyer for any future communications.

62. Phone records obtained for a cell phone number that Garbowski has repeatedly identified as his reflect that, on or about August 19, 2017, at approximately 10:07 a.m. (Central Time), Garbowski placed a 75 second call to Individual G's cellular telephone. This call is consistent with the approximate time that I observed Garbowski and Individual G using their cell phones after the Subject Vessel was docked.

63. Records obtained from Get My Boat reflect that Individual G reserved the Subject Vessel for five hours (10:00 a.m. to 3:00 p.m.) on August 19, 2017, through Get My Boat. The host of the vessel is identified as "Mike Gunnman" and indicates an email address that other information from the investigation associates with Garbowski.

64. On August 24, 2017, a written version of COTP Order 11-17 was mailed, return receipt requested, to Garbowski at his home address in Sterling Heights, Michigan, and was also transmitted electronically to an email address associated with GSKI Group, LLC. A United States Postal Service return receipt indicates that the letter was received at the Sterling Heights address on or about August 26, 2017.

The COTP Order was addressed to "M/V SEA HAWK" to the "Attn: Christopher Grabowski" [sic]. The COTP Order provided, in relevant part, as follows:

**CAPTAIN OF THE PORT ORDER 11-17: M/V SEA HAWK, O.N. 1192154**

On August 19, 2017 members of my staff, in the vicinity of Monroe Harbor, Chicago, IL, observed the M/V SEA HAWK, O.N. 1192154, operating with passengers for hire. The Coast Guard has no current record of your vessel being inspected as a small passenger vessel or being operated by an individual licensed by the Coast Guard for this vessel and route.

Title 46 United States Code (U.S.C.) § 3301(8) states that small passenger vessels are subject to inspection. Additionally, 46 U.S.C. § 8902, requires small passenger vessels be operated by an individual licensed by the Secretary to operate that type of vessel in the particular geographic area, under prescribed regulations. Furthermore, 46 U.S.C. § 8903, requires self-propelled, uninspected passenger vessels be operated by an individual licensed by the Secretary to operate that type of vessel, under prescribed regulations.

Therefore, M/V SEA HAWK, O.N. 1192154, is hereby ordered to immediately cease operations as a commercial passenger vessel until such time as it can be shown to the satisfaction of the Coast Guard that it is operated by an individual holding an appropriate license and is in compliance with all federal laws and regulations.

This order is given under the authority of Title 33 U.S.C. § 1223(b), effective August 19, 2017, and will remain in effect until rescinded by my office. To be released from operating restrictions of this letter, within 30 days from the date of this order, you shall notify my office in writing of your intention to operate as a commercial vessel. If you choose to operate as a small passenger vessel or uninspected passenger vessel, you will remain restricted from carrying passengers for hire until you comply with all applicable federal laws and regulations.

Failure to comply with this order may result in a civil penalty of not more than $90,063.00 pursuant to 33 U.S.C. § 1232(a), with each day of continued operation constituting a separate violation. Furthermore, a willful and knowing violation of this order under 33 U.S.C. § 1232(b) constitutes a Class D Felony which may expose you to

a term of imprisonment not to exceed 10 years, and a fine not to exceed $250,000.00.

Should you feel aggrieved by this order, you may request reconsideration to me directly. If I do not rescind this order based on your request, you may appeal my decision to the Commander, Ninth Coast Guard District. While any request of appeal is pending, all provisions of this order will remain in effect. Reconsideration requests or appeals must follow the procedures prescribed in Title 33, Code of Federal Regulations (CFR) § 160.7.

If you have any questions please contact our 24-hour watch at (414) 747-7182; fax (414) 747-7883.

F.    Garbowski Continues to Conduct Unlawful Commercial Charters in 2017 Using the Subject Vessel After the First COTP.

65.    Despite the issuance of the first COTP on the morning of August 19, 2017, evidence establishes that Garbowski conducted another commercial charter on the afternoon of August 19, 2017. PayPal records indicate that, on or about June 15, 2017, Garbowski transmitted a billing invoice to Individual H1 in the amount of $517.50. PayPal records also reflect that, on or about August 20, 2017, Individual H1 paid $517.50 to Garbowski, with a subject line notation "Payment to Manaje Productions for invoice 081917."

66.    On or about February 28, 2019, I telephonically interviewed Individual H1, who is a resident of Texas. Individual H1 confirmed that she chartered a vessel for the afternoon of August 19, 2017. The charter was for a bachelorette party for approximately 10 of her friends. Individual H1 stated that she located the vessel on Boatbound, and paid for the vessel through PayPal. The voyage consisted of a trip to the Playpen and included the cost of a captain and fuel. Individual H1 stated that she also tipped the captain. Individual H1 also stated that they ordered food and

drinks through the captain (whose name was named "Mike" or "Mike Manaje") and then reimbursed him afterward. Individual H1 stated that she paid the money for the voyage up front and that her friends split the cost of the charter voyage with her afterward. Individual H1 believed that the captain also had a male crewmember. She did not recall signing any contracts or waivers and did not know who owned the vessel. When asked, Individual H1 vaguely recalled that "Mike" may have asked or text messaged her with a request that she not disclose that she signed a contract, to not call attention to themselves, and to "fly under the radar" (Individual H1's words). She did not ask if the captain had a merchant mariner credential. She believed that the vessels on Boatbound were operating legally and would not have reserved the charter if she knew it was operating illegally. She found it odd that she was asked to make payment outside of the Boatbound website.

67.     In or about June 2019, I again contacted Individual H1, who provided to me a copy of the contract that she signed for the chartering of the Subject Vessel. The contract, which was nearly identical to the contract provided by Individual G for her charter voyage, recites that the "rental amount" is $1,800 for a five-hour rental period from 3:30 p.m. 8:30 p.m. on August 19, 2017. The contract contained the following non-disclosure provision (emphasis in original):

**NON-DISCLOSURE:**
THIS CONTRACT IS CONFIDENTIAL AND SHALL NOT BE
DISCLOSED WITH ANY PERSONS, AUTHORITIES, AGENCIES OR
ANY OTHER PARTIES EXCEPT THE RENTER AND PASSENGERS.
NEITHER PARTY SHALL ADVERTISE, PUBLICLY ANNOUNCE, OR
OTHERWISE STATE THAT IT HAS ENTERED INTO A
CONFIDENTIALITY AGREEMENT WITH THE OTHER PARTY.
WITHOUT LIMITING THE FOREGOING, NEITHER PARTY SHALL

USE THE OTHER PARTY'S NAME OR NAMES OR ITS AFFILIATES OR REPRESENTATIVES IN ANY WEBSITE DISPLAYS OR OTHER MATERIALS.
RECIPIENT ACKNOWLEDGES THAT (A) ANY BREACH OF THE PROMISES OR AGREEMENTS HEREIN MAY RESULT IN DAMAGE TO DISCLOSER FOR WHICH THERE WILL BE NO ADEQUATE REMEDY AT LAW, AND (B) IN THE EVENT OF BREACH, DISCLOSER SHALL BE ENTITLED TO SEEK INJUNCTIVE RELIEF AND/OR A DECREE FOR SPECIFIC PERFORMANCE, AND SUCH OTHER RELIEF AS MAY BE PROPER, INCLUDING MONETARY DAMAGES.

Additional information received from Individual H1 resulted in law enforcement identifying Individual H2 (a resident of New York) as a passenger on the Subject Vessel with Individual H1 on August 19, 2017. Venmo records reflect that, on or about August 17, 2017, Individual H2 paid $2,050 to Garbowski, along with an associated note stating, "Boat trip."[16]

68.     PayPal and Venmo records suggest that Garbowski continued to engage in commercial charter operations during the remainder of 2017. As just one example, Venmo records show that, on August 30, 2017, Individual I paid $500 to Garbowski with an associated note containing a boat emoji. PayPal records reflect that on September 2, 2017, Individual I paid $2,500 to Garbowski. Venmo records reflect that, on September 7, 2017, Garbowski paid $500 to Individual I with an associated note of ":venmo: back at ya."

---

[16] Based upon my review of Garbowski's online charter accounts, I know that he sometimes indicates that there is an additional charge of $250 for boat cleaning and fuel. I suspect, but have not yet confirmed, that the amount of money Individual H2 paid to Garbowski was the sum of the $1,800 charter fee plus a $250 cleaning/fuel feel.

69.     On or about May 28, 2019, I interviewed Individual I. During the interview, Individual I stated that he used Boatbound to charter a voyage for Saturday, September 2, 2017. Individual I located the Subject Vessel (under the name Sea Hawk) and communicated via text messages and email with the owner, who, based upon Facebook photos of Garbowski that I presented, Individual I identified as Garbowski. Individual I confirmed that he made the payments described in the previous paragraph. Individual I stated that his payment included all fees, fuel and the captain, but not food or beverages. The crew consisted of the captain and one male crew member. Individual I could not recall if he signed a contract or waiver for the voyage. Individual I stated that his party consisted of approximately 8 to 10 passengers that were all friends of his. The voyage lasted 4-5 hours and consisted of traveling from Monroe Harbor to the Playpen.  He would not have chartered the vessel if he thought they were operating illegally.

70.     Other evidence suggests that Garbowski engaged in commercial charters on Sunday, September 3, 2017, and Saturday, September 16, 2017.

G.     <u>Using False Pretenses, Garbowski Induces the Coast Guard to Rescind the First COTP.</u>

71.     By no later than September 26, 2017, the Coast Guard received by mail a letter from Garbowski. The letter is dated September 18, 2017, and purports to be from "M/V SEA HAWK, Christopher Garbowski" and is addressed to the Captain of the Port in Milwaukee. The letter reads:

**Captain Of The Port Order 11-17: M/V SEA HAWK, O.N. 1192154**

> To whom it may concern:
>
> I do have any intention on operating my vessel for commercial purposes.
>
> On Aug 19, 2917, the USCG boarded my vessel and deemed it a commercial operation. This was not the case. I did not collect any payments or any form of monetary value from any passengers on my vessel. This is my first season of ownership and did not know all the liabilities of asking guests to pitch in for gas. I did not and was not physically collecting any money from any of my guests for chartering. I ask to please review and re-evaluate the fines assessed to M/V SEA HAWK, O.N. 1192154 and myself, Christopher Garbowski.

The letter bears a handwritten set of initials and/or name signatures above the name "Christopher Garbowski."

72. On or about September 26, 2017, a Coast Guard official transmitted an email to Garbowski at the email account listed on the letter. In that email (most likely due to the first sentence of Garbowski's letter, which suggested that he intended to conduct commercial charters), the Coast Guard mentioned that the letter was "a little unclear," but nonetheless proceeded to direct Garbowski to the requirements for becoming a commercial charter operator:

> If your intention is to operate commercially in the future, please submit an application for inspection (found here: https://www.uscg.mil/forms/cg/CG_3752A.pdf) to our office via this email address: SMBMSUChicago@uscg.mil. This will start the process for you to become a commercial passenger vessel that carries seven or more passengers.
>
> If you would like to operate as a commercial passenger vessel that carries six or fewer passengers, you can meet the requirements of an uninspected vessel (46 CFR Subchapter C, the same regulations you need to meet already), be manned by a credentialed captain with a license appropriate for your vessel and the credentialed captain must

34

be enrolled in a drug and alcohol testing program. Please see the attached PDF for more information.

Please let me know what you would like to do, and/or if you have any further questions or concerns. Thanks!

The Coast Guard also attached an electronic version of a brochure that recited the rules for engaging in commercial charter operations.

73.     Approximately 57 minutes after the email described in the previous paragraph was transmitted, the Coast Guard received a response email from the same email account identified in Garbowski's letter (with the sender field populated by the name "Mike Gski"). That email was directed toward the author of the Coast Guard email described above and bore the following substance:

My apologies for the unclear letter.
My opening statement, first line, was meant to read:
"I do not have any intention on operating my vessel for commercial purposes."

I am not in the business of chartering and if I ever do consider it, I will immediately contact you to apply for commercial status.

Sorry for the inconvenience and thank you for the follow up.

Sincerely,
Chris Garbowski

74.     On or about October 23, 2017, the Coast Guard rescinded COTP Order 11-17. The rescission letter to Garbowski stated, in relevant part, as follows:

**RESCISSION OF CAPTAIN OF THE PORT ORDER 11-17: M/V SEA HAWK, O.N. 1192154**

You have met the requirements of COTP Order 11-17 by notifying my office in your letter dated September 18, 2017, and your email to Marine Safety Unit ·Chicago on September 26, 2017, that you will operate the M/V SEA HAWK as a recreational vessel and not as a charter or commercial vessel with passengers for hire.

The Coast Guard has made a long-term commitment to enforce all applicable federal regulations for passenger vessels. The Coast Guard will be conducting periodic, unannounced boardings of vessels suspected to be operating illegally as passenger vessels. Passenger vessels operating without a valid Certificate of Inspection (46 U.S.C. § 3318) or without a properly licensed mariner may face a maximum civil penalty of $15,000 for each day the violation occurs.

Additionally, credentialed merchant mariners found violating marine safety laws and regulations may face suspension and/or revocation of their credential. Finally, any false statements provided to my office regarding your intentions may result in fines and/or imprisonment for up to five years pursuant to 18 United States Code § 1001 and § 2237.

If you have any questions, please contact MSU Chicago Inspections Branch at (630) 986-2155 or by email at SMBMSUChicago@uscg.mil.

H.    Garbowski Continues to Engage in Charter Operations During the 2018 Boating Season.

75.    PayPal and Venmo records contain entries that are consistent with Garbowski engaging in commercial charter operations during the 2018 boating season. For example, Venmo records indicate the following:

a.    On or about June 8, 2018, Individual J paid $500 to Garbowski with an associated note containing a sailboat emoji. On or about June 9, 2018, Individual J paid $1,200 to Garbowski with an associated note containing a sailboat emoji.

b.    On or about June 22, 2018, Individual K paid $500 to Garbowski with an associated note stating "boat deposit." On or about June 23, 2018, Individual K paid $1,250 to Garbowski with an associated note stating "Boat stuff."

c. On or about June 30, 2018, Individual L paid $500 to Garbowski with an associated note stating "Boat Deposit (August 18) 1..."

d. On or about July 4, 2018, Individual M paid $2,000 to Garbowski with an associated note stating "1." On or about July 4, 2018, I observed the Subject Vessel (under the name Manaje III) being operated by Garbowski on a suspected charter voyage with approximately 15 passengers.

e. On or about July 7, 2018, Individual N1 paid $1,500 to Garbowski with an associated note stating "A." Also on July 7, 2018 Individual N2 paid $1,000 to Garbowski with an associated note that appears to reference the name of Individual N1 followed by the word "boat." On or about July 7, 2018, I observed the Subject Vessel (under the name Manaje III) being operated by Garbowski on a suspected charter voyage with approximately 22 passengers.

f. On or about July 9, 2018, Individual O paid $500 to Garbowski with an associated note stating "Deposit for Boat on 7/14/18." On July 14, 2018, Garbowski paid $500 to Individual O with an associated note containing a "deposit back" emjoi.

76. On July 6, 2018, Coast Guard personnel boarded the Subject Vessel while it was on the Chicago River. The boarding offices identified Garbowski as the operator of the Subject Vessel, upon which there were 14 adults in total.

I. <u>Garbowski Again Lies About Conducting Commercial Charter Operations During a Coast Guard Boarding on July 14, 2018.</u>

77. On or about July 14, 2018, during surveillance activity, I observed several individuals board the Subject Vessel (under the name Manaje III). Less than

an hour later, Coast Guard boarding officers entered onto the Subject Vessel while it was moored at Monroe Harbor.[17] I was present on the dock during the course of the boarding activity. During the initial boarding, one of the boarding officers questioned Garbowski, who acknowledged that he owned the vessel through a Delaware corporation (GSKI Group, LLC). Garbowski asserted that he had not registered the Subject Vessel in Illinois because he purchased it less than one year ago. Garbowski and the boarding officer exited the Subject Vessel and I and another Coast Guard member conducted an interview of Garbowski on a Coast Guard vessel. The boarding officer returned to the Subject Vessel to continue questioning the passengers. The following occurred during the course of my interview with Garbowski:

    a.    At the outset of my interview with Garbowski, I cautioned Garbowski that it was a criminal offense under 18 U.S.C. § 1001 to make false statements to federal agents. Garbowski acknowledged his understanding.

    b.    Garbowski stated that he purchased the Subject Vessel in 2017 and that he has never owned any other vessels. Garbowski stated that he did not have a merchant mariner's credential and did not know the safe loading capacity of the Subject Vessel.

    c.    Garbowski acknowledged that he had not registered the vessel in Illinois, despite the fact that the vessel was indicated as homeported in Chicago, Illinois; rather, Garbowski claimed that he brought the vessel to

---

[17] The boarding officers verified that the vessel was, in fact, the Subject Vessel based upon the hull identification number and the fact that the engine compartment of the vessel included a prominent decal of the Subject Vessel's NVDC identification number (1192154).

Chicago in July 2018 and intended to return it to Michigan within 60 days.[18] Garbowski claimed that he occasionally worked as a real estate agent (but had no primary employment) and used the Subject Vessel every weekend with friends or prospective real estate clients.

d. Garbowski stated that the voyage about to take place on the Subject Vessel at the time of the Coast Guard boarding had been arranged the day before by Individual P1 for the benefit of Individual P2 and 17 of Individual P2's friends.

e. Garbowski stated several times during the interview that he has never operated a charter voyage on his vessel and has never received money or payment for operating the vessel.

f. Garbowski also stated that he does not and has not ever had an online account to charter vessels, including at either Boatbound or Get My Boat. I informed Garbowski that he received money on August 5, 2017, August 7, 2017, and January 27, 2018, for chartering vessels. Garbowski denied knowledge of having received money on those dates. I reminded Garbowski that he was issued a COTP Order on August 19, 2017, when the Subject Vessel was boarded, and that I was present when the COTP Order was issued to him. Garbowski denied knowledge of the charter voyage associated with the boarding and stated that he did not recall my presence during the

---

[18] Under Illinois law, a vessel that have been documented with the NVDC must be registered with IDNR if used upon the waters of this State for more than 60 days in any calendar year. *See* 625 ILCS 45/3.

events. Garbowski stated that he mailed a response (via United States Postal Service) to the Coast Guard, and that the COTP Order was suspended.

g.     I then presented Garbowski with a copy of the charter voyage contract for the August 19, 2017, voyage booked by Individual G (as discussed above in paragraph 61). Garbowski initially declined to comment on the contract and then asked if he could have a copy of the contract. I informed Garbowski that he already had a copy of the contract since it was his contract and within his email. Garbowski stated that he did not recognize the contract and was not willing to discuss the non-disclosure agreement portion of the contract.

h.     I then provided Garbowski with surveillance photographs from the August 5, 2017, July 4, 2018, and July 7, 2018 voyages. Garbowski stated that all the passengers on those voyages were his friends and that none of the passengers paid money for the voyage. Garbowski signed the July 2018 photographs notating that the passengers were his friends and did not pay for the voyage. Garbowski did not sign the photograph from August 5, 2017, asserting that it was too blurry to identify the passengers.

i.     Garbowski stated that the Coast Guard had already boarded the Subject Vessel once in 2018 (the July 6, 2018, boarding) and further stated that, on that occasion, the passengers on the vessel were personal friends and none had paid for the voyage.

j.    Garbowski also initially stated that some of his friends occasionally took his boat out without him being aboard, but later in the interview denied knowledge of any persons, including personal friends, operating the Subject Vessel without him being on board. Garbowski stated that he believed that the Coast Guard was trying to "get" Garbowski for conducing charters. I explained that charter voyages could be very profitable if done legally and the Coast Guard was willing to help him do it lawfully.

78.    Meanwhile, during the first phase of my interview with Garbowski, Coast Guard boarding officers inquired of the approximately 17 other adult passengers on board the Subject Vessel regarding how they came to be on the Subject Vessel that day. Those individuals generally claimed to be friends with each other. One of the boarding officers made contact with Individual P2, whom the boarding officer recognized from a previous boarding and, based on past interaction, knew Individual P2 was a Wisconsin resident who frequently chartered vessels when he traveled to Chicago. Individual P2 first stated that he rented the vessel, but clarified that, in fact, the charter was set up by Individual P2's attorney from North Carolina (Individual P1). However, later in the interview, Individual P2 then stated that the lawyer often referred potential real estate clients to Garbowski. According to Individual P2, the lawyer contacted Garbowski, who agreed to take Individual P2 and his friends out on the vessel. Individual P2 stated that he did not pay any money for the voyage and, further, was pretty sure that the attorney from North Carolina did not pay any money either.

79. The Coast Guard boarding officer thereafter informed me of the information he obtained from Individual P2. I informed Garbowski that it was a fact that he was engaging in commercial charter operations and that he was doing so in violation of State of Illinois and Coast Guard safety regulations. Garbowski again denied that he was engaged in conducting charter operations. I provided Garbowski with Coast Guard pamphlets that described the rules for conducting commercial charter operations and how to obtain a COI. A boarding officer served Garbowski with a written warning for illegally using a vessel to conduct an illegal commercial charter voyage, and advised Garbowski to look into Illinois vessel registration requirements.

80. Although asked to do so, neither Individual P2 nor Garbowski were able to provide contact information for Individual P1, both claiming that they had it stored elsewhere and did not have immediate access to it.

81. Despite the statements made by Individual P2 and Garbowski on July 14, 2018, information developed later during the investigation, as summarized below, established that the voyage taking place when the Coast Guard boarded the Subject Vessel on July 14, 2018, was a commercial charter voyage.

82. On or about July 25, 2018, I conducted a telephonic interview of Individual P1, who was the person Garbowski identified as having arranged the charter of the Subject Vessel for the voyage on July 14, 2018.[19] During that interview, Individual P1 stated that he is a resident of North Carolina and works as an event

---

[19] Notably, Individual P1's actual name varies slightly from the last name of Individual P1 as asserted by Garbowski. This discrepancy suggests that, contrary to Garbowski's claim at the time, Individual P1 was not a close business acquaintance of Garbowski.

planner.[20] Individual P1 stated that he located the Subject Vessel on either Get My Boat or Boatbound and then introduced Individual P2 to the owner of the Subject Vessel (*i.e.*, Garbowski). Individual P1 stated that his only connection to this incident was to arrange the charter. He further stated that he did not sign any contracts or make any payments, and that the costs of the charters he reviewed were in the range of approximately $2,500 to $4,500.

83.     On or about July 25, 2018, I conducted a telephonic interview of Individual P2. During that interview, Individual P2 stated that he and a friend of his (Individual P3) had, on or about June 22, 2018, paid $500 to Garbowski through Get My Boat as a deposit on a charter vessel voyage with Garbowski, but that the voyage was cancelled. Individual P2 stated that Garbowski agreed to "comp" Individual P2 for that cancellation by taking Individual P2 and his friends for a boat cruise on the Subject Vessel on July 14, 2018. Individual P2 stated that, after the voyage, Garbowski began asking to be paid $3,750 for the July 14, 2018, voyage. Individual P2 also stated that, on or about July 18, 2018, he booked a chartered voyage with Garbowski for the 2018 Chicago Air and Water Show (which I know to have been held in August 2018) but Individual P2 decided against it because that voyage would cost even more money. Individual P2 also stated that, upon review of his correspondence with Garbowski, he noticed that Garbowski requested that he not speak about the fact that the voyage was a charter voyage.

---

[20] I asked Individual P1 if he arranged the trip for Individual P2's lawyer, but Individual P1 stated that he was unaware that Individual P2 even had a lawyer.

84.     Records obtained during the course of the investigation reflect the following with respect to the July 14, 2018, voyage on Subject Vessel that was boarded by the Coast Guard:

a.      Garbowski and Individual P1 first communicated about the July 14, 2018, voyage on or about July 11, 2018, through a professional networking website, LinkedIn. In that exchange, Garbowski (using account name ""Michael Garbowski") asked Individual P1 if he had "reach[ed] out on get my boat" and invited him to "chat." Individual P1 responded that he had and provided Garbowski with his cell phone number. During a subsequent text exchange, Garbowski advised Individual P1 that he could accommodate approximately 20 passengers on the Subject Vessel. The messages also reflect that Garbowski was also attempting to procure a 55' vessel for the charter as well.

b.      On or about July 13, 2018, Garbowski transmitted via email a contract to Individual P1 for the voyage. The contract recites that the "rental amount" is $3,750 for an eight-hour rental period from 11:00 a.m. until 7:00 p.m. The contract contained the same non-disclosure provision that appeared in the contracts executed by Individuals G and Individual H1 (as quoted in paragraph 67, above) but further included the following additional language (emphasis in original):

**PARTY UNDERSTANDS AND WILL CLAIM NO MONIES WERE PAID FOR THE DAY ON THE BOAT FOR CHARTER, CAPTAIN, GAS, FOOD, DRINKS OR ANYTHING ELSE IN CONSIDERATION. WE ARE FRIENDS.**

c.     The email message from Garbowski to Individual P1 transmitting

the contract stated as follows:

> Hi [First Name of Individual P1],
>
> Attached is the contract.
> Can you tell me about your clients?
> My only request is that they do not talk about the day as being a charter.
> Just that I am your realtor and it's a client entertainment trip where no monies were paid.
> If we are stopped or bothered by the coast guard, I need everybody on the same page that no body [sic] paid for anything. Not food, drinks, gas, boat or anything.
>
> I could probably come over to the gas dock at Burnham but not the yacht club.
>
> Let me know how your [sic] prefer to send payment.
> Venmo, chase quickpay or paypal all work for me.
>
> Lastly,
> I'm still trying to pull off the 55ft boat.
> If so, it'll be 6500.
>
> Let me know if you have any questions.
>
> Thanks,
> Mike Garbowski
> [Garbowski's cell phone number]

d.     On or about July 14, 2018, at 3:54 p.m. (Eastern Time), Garbowski transmitted a text message to Individual P1 that stated: "Don't answer any calls today, please, coast gaurd [sic] is boarding us."

e.     On or about July 16, 2018, Garbowski sent the following text message to Individual P1: "[First Name of Individual P1], thanks again for booking. [First Name of Individual P2] was a great guy, we dodge [sic] the coast

gaurd [sic] who interrogated us. I'm glad you relayed the message, if they contact you, we refer clients to each other. Lastly, who is completing payment?" In subsequent text message exchanges, Garbowski confirmed that the balance due for the voyage was $3,250.[21] Further text messages between Garbowski and Individual P1 and Individual P2 reflect that Garbowski had to send repeated messages asking for full payment.

      f.      On or about July 26, 2018, Individual P2 notified Garbowski that "Coast guard has been call me." In response, Garbowski stated, "Don't talk with them, you have no obligation to them."

      g.      It appears that the July 14, 2018, charter voyage was paid in full on or about August 20, 2018.

    85.      Based on the contents of the contract and its accompanying email message described above, my experience and training, and the evidence gathered during this investigation as a whole, I believe that Garbowski attempted to persuade Individual P1 to provide false information if questioned about whether money was paid in exchange for the July 14, 2018, voyage on the Subject Vessel. For similar reasons, I believe that, in his text message on July 6, 2018, Garbowski intended to express his gratitude to Individual P1 for informing Individual P2 to likewise lie to the Coast Guard ("we dodge the coast gaurd who interrogated us. I'm glad you relayed the message"), and continued to urge Individual P1, if contacted by the Coast Guard,

---

[21] PayPal records reflect that on or about July 13, 2018, Individual P3 paid $500 to Garbowski. Text messages verify that the payment was made for the purpose of renting the Subject Vessel.

to continue to claim falsely that Individual P1 and Garbowski had a business relationship ("if they contact you, we refer clients to each other").

J. <u>On or about July 27, 2018, I Served the Second COTP Order Upon Garbowski.</u>

86. On or about July 27, 2018, I located the Subject Vessel at Monroe Harbor in Chicago, Illinois. At that time, I personally served Garbowski with a second COTP Order. A copy of that COTP Order is attached hereto as Attachment A. Under its terms, the second COTP was effective as of July 27, 2018. Garbowski refused to sign for receipt of the COTP without obtaining legal advice first. I took a photograph of Garbowski with the COTP Order in his possession (in one of his pockets). During my interaction with Garbowski, Garbowski again asserted that he was not operating the Subject Vessel commercially. I verbally informed Garbowski three times that if he operated the Subject Vessel commercially then he could face severe penalties, to include arrest and felony charges. I also advised Garbowski to contact the MSU office in Willowbrook, Illinois, or the Coast Guard Sector Lake Michigan office in Milwaukee, Wisconsin, if he had any questions.

K. <u>Garbowski Engaged In Commercial Charter Operations After Service of the Second COTP Order.</u>

87. On or about July 28, 2018, the day after I served the second COTP Order upon Garbowski, Coast Guard personnel observed several individuals on board the Subject Vessel (under the name Manaje III) inside the Playpen. This was during the "Chicago Scene Party" inside the Playpen. The Coast Guard personnel, having been advised about the issuance of the second COTP Order and knowing that the Subject

Vessel was suspected of engaging in unlawful charter operations, boarded the Subject Vessel at approximately 2:40 p.m. and counted approximately 23 passengers on board. The boarding officers identified Garbowski as the owner and captain of the Subject Vessel. During an interview, Garbowski told the boarding officers that he was aware of the second COTP Order and understood its terms.[22] Garbowski also stated that the voyage was not a commercial charter. Statements made by some of the passengers to the boarding team were similar to each other and generally involved claims that the passengers were friends of Garbowski. Although the statements were deemed suspicious, the boarding team allowed the Subject Vessel to continue its voyage because they lacked clear evidence at that time that the voyage was a commercial charter.

88.     Evidence developed during this investigation, as summarized below, establishes probable cause to believe that Garbowski was, in fact, conducting a commercial charter voyage at the time of the Coast Guard boarding on July 28, 2018:

      a.     In particular, as discussed above, on or about February 8, 2019, I interviewed Individual C, who stated that he chartered the Subject Vessel multiple times in 2017 and 2018, and that Garbowski was the captain for each of his trips, each of which involved approximately 15 passengers. Individual C

---

[22] Near the beginning of the boarding, another individual jumped in the water from a nearby vessel and swam up to the Subject Vessel, and thereafter claimed to be Garbowski's attorney. That individual was aggressive with the boarding team, but remained present during the subsequent questioning of Garbowski. I have interviewed the individual on two occasions. During a conversation in or about May 2019, the individual stated that he only represented Garbowski on civil matters (not criminal matters) and that he was not presently representing Garbowski on any matter.

also stated that he and his groups always boarded the vessel at Monroe Harbor in Chicago, with the Playpen as their destination. Individual C stated that his charter fees included fuel and a captain, but did not include food or alcohol. Individual C stated that he separately provided a tip to Garbowski as well. Individual C also stated that, on two of the voyages, the Coast Guard boarded the vessel, apparently to inquire with respect to underage drinking.

b.     During the interview, Individual C confirmed that Garbowski last operated a charter voyage for him on or about July 28, 2018, for the Chicago Scene Boat Party. I showed to Individual C Venmo records that confirmed that Individual C paid approximately $1,110 for the charter voyage on July 28, 2018, and Individual C stated that the payment was for the July 28, 2018, charter voyage to the Playpen. Individual C stated that he arranged the charters and paid Garbowski for the charter voyages, for which his friends chipped in and paid back Individual C. Individual C identified Individual Q was one of the guests on the July 28, 2018 charter voyage.

c.     On or about February 9, 2019, I interviewed Individual Q and his roommate, Individual R. Each of the individuals stated that he had been on Garbowski's boat on multiple occasions and considered Garbowski to be a friend. They each both claimed to be on Garbowski's vessel in late July or early August when it was boarded by the Coast Guard, but each also claimed that he did not interact with the boarding officers. Individual Q stated that in the past he has transferred money to Garbowski via Venmo for various things, to

include fuel for Garbowski's boat, bar service at local bars and for tips from group meals.

    d.     Venmo records reflect that, on or about July 29, 2018, Individual Q transferred approximately $2,090 to Garbowski via Venmo with an associated note stating, "Brunch."

## IV.  <u>CONCLUSION</u>

89.    Based upon the foregoing, I submit that there is probable cause to believe that, on or about July 28, 2018, defendant CHRISTOPHER MIKE GARBOWSKI willfully and knowingly violated the terms of an Order of the Captain of the Port, Sector Lake Michigan, in violation of Title 33, United States Code, Section 1232 (as in effect prior to December 4, 2018).

FURTHER AFFIANT SAYETH NOT.

_____

ASHER THOMAS
Special Agent, U.S. Coast Guard
Investigative Service

SUBSCRIBED AND SWORN to before me on June 25, 2019.

_____

YOUNG B. KIM
United States Magistrate Judge

ATTACHMENT A



**U.S. Department of Homeland Security**

**United States Coast Guard**

Captain of the Port
United States Coast Guard
Sector Lake Michigan

2420 S. Lincoln Memorial Drive
Milwaukee, WI 53207
Phone: (414) 747-7182
Fax: (414) 747-7883

16731
July 27, 2018

M/V MANAJE III/SEA HAWK
Attn: Christopher "Michael" Garbowski
43215 Cove Court
Sterling Heights, MI 48313
GSKIGroup@gmail.com

**CAPTAIN OF THE PORT ORDER 11-18: M/V MANAJE III/SEA HAWK, O.N. 1192154**

On July 14, 2018, members of my staff, in the vicinity of Monroe Harbor, Chicago, IL, boarded the M/V MANAJE III/SEA HAWK, O.N. 1192154, operating with eighteen (18) people on board. When you were asked, you and your passengers told the boarding officer that no money was given to you in exchange for the voyage. We have since received evidence that clearly indicates money was exchanged and that these were passengers for hire. We have determined that the voyage was commercial in nature.

After receiving Captain of the Port Order 11-17 on August 19, 2017, for operating with passengers for hire, you notified my office in your letter dated September 18, 2017, and your email to Marine Safety Unit Chicago on September 26, 2017, that you would operate the M/V SEA HAWK, O.N. 1192154 as a recreational vessel, not as a charter or commercial vessel with passengers for hire.

The Coast Guard has no current record of your vessel being inspected as a small passenger vessel or being operated by an individual licensed by the Coast Guard for this vessel and route. Title 46 United States Code (U.S.C.) § 3301(8) states that small passenger vessels are subject to inspection. Additionally, 46 U.S.C. § 8902, requires small passenger vessels be operated by an individual licensed by the Secretary to operate that type of vessel in the particular geographic area, under prescribed regulations. Furthermore, 46 U.S.C. § 8903, requires self-propelled, uninspected passenger vessels be operated by an individual licensed by the Secretary to operate that type of vessel, under prescribed regulations.

Therefore, M/V MANAJE III/SEA HAWK, O.N. 1192154, is hereby ordered to immediately cease operations as a commercial passenger vessel until such time as it can be shown to the satisfaction of the Coast Guard that it is operated by an individual holding an appropriate license and is in compliance with all federal laws and regulations. This order is given under the authority of Title 33 U.S.C. § 1223(b), effective July 27, 2018, and will remain in effect until rescinded by my office.

Failure to comply with this order may result in a civil penalty of not more than $90,063.00 pursuant to 33 U.S.C. § 1232(a), with each day of continued operation constituting a separate violation. Furthermore, a willful and knowing violation of this order under 33 U.S.C. § 1232(b)

constitutes a Class D Felony which may expose you to a term of imprisonment not to exceed 10 years, and a fine not to exceed $250,000.00.

Should you feel aggrieved by this order, you may request reconsideration to me directly. If I do not rescind this order based on your request, you may appeal my decision to the Commander, Ninth Coast Guard District. While any request of appeal is pending, all provisions of this order will remain in effect. Reconsideration requests or appeals must follow the procedures prescribed in Title 33, Code of Federal Regulations (CFR) § 160.7.

If you have any questions please contact our 24-hour watch at (414) 747-7182; fax (414) 747-7883.

Sincerely,

T. J. STUHLREYER

Copy: Commander, Ninth Coast Guard District (dp)

Acknowledgement of Receipt / Proof of Service (circle one):

Name: _MIKE GARBOWSKI_      Signature: _REFUSED_

Title: _OWNER_      Place: _MONRE HARBOR_

Date: _27 JUL 2018_      Time: _1731 HRS_

2