UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | Case No. 19 CR 526 |
| vs. ) | |
| ) | Thomas M. Durkin |
| CHRISTOPHER MIKE GARBOWSKI ) | |

GOVERNMENT'S SENTENCING MEMORANDUM

The UNITED STATES OF AMERICA, by Acting United States Attorney MORRIS PASQUAL, hereby submits its sentencing memorandum in above-captioned matter.

OFFENSE CONDUCT

As more fully summarized in the Presentence Investigation Report ("PSR") (¶¶ 6-27), the Government's Version of the Offense ("GVO") attached to the PSR, and the plea agreement (Dkt. No. 126, ¶ 6), between 2017 and 2019, defendant Christopher Mike Garbowski ("Garbowski") willfully and knowingly violated an order of the Captain of the Port ("COTP Order"), in violation of 33 U.S.C. § 1232(b)(1) (as in effect prior to December 4, 2018), by conducting illegal vessel charter voyages on the Chicago area waterway system, particularly on the Chicago River and Lake Michigan, including an area north of Navy Pier referred to in the boating community as "the Playpen."

In particular, after acquiring the subject vessel in or about June 2017, Garbowski began conducting commercial charter voyages even though: (a) the vessel had not been issued a Certificate of Inspection ("COI") from the United States Coast

Guard; and (b) Garbowski had not obtained a merchant mariner credential ("MMC") that was required for him to captain a vessel engaged in commercial service. The COI and MMC requirements are intended, respectively, to ensure that (a) the vessel is properly constructed and outfitted to ensure the safety of passengers and crew aboard a vessel in commercial service, and (b) the master of a vessel in commercial service has the proper training and experience needed to operate the vessel in a safe and competent manner. Garbowski advertised the vessel as available for charter rental (with Garbowski serving as captain) on various websites. Garbowski never attempted to obtain a COI for the vessel or the required MMC allowing him to captain the vessel in commercial service. Garbowski conducted these commercial charter voyages through a Delaware limited liability company, GSKI Group, LLC ("GSKI"), of which he was the sole member.

On the morning of August 19, 2017, the Coast Guard confronted Garbowski near Monroe Harbor in downtown Chicago as he was about to depart on a commercial charter voyage for Individual G. Even though Garbowski falsely stated that he was not conducting a commercial charter voyage, the passengers admitted that it was, in fact, a commercial voyage.[1] The Coast Guard terminated the voyage before it got underway and issued to Garbowski a COTP order ("the First COTP Order"), which prohibited Garbowski from engaging from using the subject vessel in any further commercial service. However, having already booked an afternoon charter voyage

---

[1] GSKI's standard contract with charter clients, including Individual G, provided that it was a breach of the contract for clients to disclose to any person or entity, including the government, the existence of the commercial charter contract.

2

with a different client, Garbowski conducted another illegal commercial voyage later the same day.

Despite the issuance of the First COTP Order and Garbowski's knowledge that it was illegal for him to conduct commercial charter voyages using the vessel, Garbowski engaged in additional illegal commercial charter voyages during the remainder of the 2017 boating season. As he did throughout the entire period of his illegal conduct, Garbowski occasionally directed his charter voyage clients and the charter passengers to lie to the Coast Guard about the nature of the voyage if they were boarded by the Coast Guard; in particular, Garbowski instructed his clients and passengers to falsely claim that that no money had been paid to Garbowski in exchange for the voyage or any expenses related thereto.

In September 2017, Garbowski communicated with the Coast Guard by letter and email about the First COTP Order. In those communications, Garbowski falsely claimed that he had not, and going forward would not, engage in illegal commercial charter voyages. As a result of Garbowski's representations, the Coast Guard rescinded the First COTP Order in October 2017.

However, in 2018, Garbowski changed the name of the subject vessel at the beginning of the boating season and, between approximately June and September 2018, continued to use the renamed vessel to conduct illegal commercial charter voyages on the Chicago area waterway system. In a further effort to prevent clients from informing authorities about the commercial nature of the voyages, Garbowski added an additional contract provision that explicitly directed clients to lie about the

3

commercial nature of the voyage; in particular, under the existing non-disclosure paragraph, defendant added the following clause in bolded font: "**PARTY UNDERSTANDS AND WILL CLAIM THAT NO MONIES WERE PAID FOR THE DAY ON THE BOAT FOR CHARTER, CAPTAIN, GAS, FOOD, DRINKS OR ANYTHING ELSE IN CONSIDERATION. WE ARE FRIENDS.**" Again, in addition to the written contract, Garbowski also verbally directed charter voyage clients and passengers to lie to the Coast Guard about the nature of the voyage.

Garbowski also continued to lie to Coast Guard personnel about the nature of his illegal charter voyages. In particular, during a commercial charter voyage on July 14, 2018, Garbowski lied to a Coast Guard boarding team by claiming that the trip was not a commercial charter voyage. Since none of the passengers contradicted Garbowski's claim, the Coast Guard boarding team allowed the voyage to continue. However, subsequent investigation established the commercial nature of this same voyage on July 14, 2018.

As a result, on July 27, 2018, the Coast Guard served upon Garbowski another COTP order ("the Second COTP Order"), which again prohibited defendant from using the subject vessel for commercial charter voyages. Despite having received the Second COTP Order and being aware of its prohibitions, defendant continued to conduct illegal commercial charter operations during the 2018 boating season.

In 2019, Garbowski again changed the vessel's name. He also attempted to transfer ownership of the vessel to another Delaware limited liability company ("Lupole LLC" – an obvious play on the word "loophole") for which one of Garbowski's

4

family members served as the sole member. However, this was entirely a nominee arrangement – Garbowski maintained operational control of the vessel, contracted with clients for charter services, and continued to serve as captain of the vessel.[2] In any event, Garbowski continued to engage in illegal commercial charter operations in violation of the Second COTP Order in 2019.

Later in June 2019, Garbowski contacted the Coast Guard Investigative Service ("CGIS") and asked for a meeting with investigating CGIS agents. On June 24, 2019, Garbowski traveled to the CGIS offices in Willowbrook and was interviewed by investigating case agents. The interview was audio-recorded and video-recorded. During that interview, among other lies, Garbowski repeatedly told the CGIS agents that he had never conducted commercial charter voyages using the subject vessel and had never advertised the subject vessel on websites as available to be hired for charter voyages. Those claims, of course, were demonstrably false.

OBJECTIONS TO THE PSR

The government has no objections to the PSR, which is thorough, detailed and well-written. As calculated by the Probation Office, Garbowski's final offense level is 15 and the advisory guidelines range is 18 to 24 months' imprisonment.

Despite the government's concurrence with the PSR's guidelines calculation, given the somewhat unusual nature of the offense of conviction, the government

---

[2] The government believes that Garbowski pursued this nominee arrangement in an effort to conceal his activity. In particular, by technically shifting ownership to Lupole, Garbowski could plausibly claim that neither he nor any of his companies owned the vessel, and that he was merely a captain hired by the charterer for a particular trip (as opposed to a captain who was provided as an included cost of the charter). At the time, this was a significant regulatory distinction. *See* GVO at pp.16-17.

wishes to elaborate further regarding why Guideline § 2B1.1 should be applied in this case.

The offense of conviction is 33 U.S.C. § 1232(b)(1), as in effect prior to December 4, 2018 (at which time it was recodified to a different section of the United States Code). The Sentencing Guidelines Manual does not cross-reference this offense to a particular guideline. Thus, the starting point for selection of an appropriate guideline is Guideline § 2X5.1, which provides, in relevant part:

> If the offense is a felony for which no guideline expressly has been promulgated, apply the most analogous offense guideline. If there is not a sufficiently analogous guideline, the provisions of 18 U.S.C. § 3553 shall control, except that any guidelines and policy statements that can be applied meaningfully in the absence of a Chapter Two offense guideline shall remain applicable.

Therefore, the initial step is determining whether there is a "sufficiently analogous guideline" that can be applied to the offense of conviction.

In its entirety, the applicable criminal statute, 33 U.S.C. § 1232 (2018), defined two separate criminal offenses, as follows:

> (b)  Criminal penalty
>
> (1) Any person who willfully and knowingly violates this chapter or any regulation issued hereunder commits a class D felony.
>
> (2) Any person who, in the willfull [sic] and knowing violation of this chapter or of any regulation issued hereunder, uses a dangerous weapon, or engages in conduct that causes bodily injury or fear of imminent bodily injury to any officer authorized to enforce the provisions of this chapter or the regulations issue hereunder, commits a Class C felony.

Garbowski was convicted under the (b)(1) prong of the statute rather than the (b)(2) prong of the statute. Notably, the Sentencing Guidelines cross-reference the

(b)(2) prong of the statute to Guideline § 2A2.4 (Obstructing or Impeding Officers). However, the government does not believe that Guideline § 2A2.4 should be applied in this case. First, if the Sentencing Commission intended for Guideline § 2A2.4 to apply automatically to both offense prongs of § 1232(b), then it would have explicitly stated so – in other words, necessarily implied in the fact that the cross-reference is limited to the (b)(2) prong is the suggestion that the same guideline should not automatically cross-reference to offenses under the (b)(1) prong. Second, this interpretation is consistent with the fact that the (b)(1) prong is extremely broad insofar as it encompasses any conduct that might violate any PWSA regulation, including but not limited to the willful and knowing violation of a COTP Order – put another way, since the (b)(1) prong encompasses a multitude of different types of actions or omissions, the absence of a specific cross-referenced offense guideline makes sense. Third, the offense defined by the (b)(2) prong appears limited to assaultive conduct that directly impedes the ability of Coast Guard officials to carry out their lawful functions of enforcing the PWSA (*e.g.*, a defendant shoving, punching, or striking a Coast Guard boarding officer). By contrast, the criminal conduct in this case – the violation of a COTP order to cease commercial charter activity – lies well outside the heartland of conduct contemplated by Guideline § 2A2.4, so it would be nonsensical to apply it automatically to cases not involving assaultive conduct.

    The government does not believe that there is a *clearly* analogous guideline that encompasses the willful violation of a COTP order. However, despite the absence of a *clearly* analogous guideline applicable to the charged conduct, it remains possible

7

to meaningfully apply the guideline that applies to economic offenses, Guideline § 2B1.1, which functions in this particular case as a "sufficiently analogous guideline." This is true because the offense conduct, at least when analyzed in relation to the defendant's motive and intent, is primarily an economic one – the crime was committed to obtain profit from unlawful commercial charter voyages. Application of Guideline § 2B1.1 also comports with the common sense fact that such cases may often involve conduct that can be charged as offenses that directly cross-reference § 2B1.1, such as mail/wire fraud and/or the making of false statements. Application of § 2B1.1 will also allow the Court to meaningfully distinguish illegal operators based on the volume and profitability of their illegal charters, as well as any other specific offense characteristics that apply to relevant conduct (*e.g.*, the use of sophisticated means, or conscious or reckless risk of death or serious bodily injury). As a result of these considerations, the government's position is that the appropriate guideline to apply, at least in the absence of evidence that the offense conduct involved a more serious offense, is Guideline § 2B1.1.[3]

Applying Guideline § 2B1.1 to the facts of this case yields the following offense level calculations, as set forth in the PSR:

---

[3] Different guidelines may apply if the offense involved non-economic harm. For example, if an illegal charter voyage resulted in the death of an individual, another guideline might apply because other charges could be brought, such as 18 U.S.C. § 1115 (seaman's manslaughter), which references to Guideline § 2A1.4 (involuntary manslaughter). Even if a defendant in such circumstances was only charged with violation of a COTP order, the guideline for the more serious offense would likely apply based upon the internal cross-reference provisions at Guideline § 2B1.1(c) or relevant conduct principles (*see* Guideline §§ 1B1.2 and 1B1.3).

| Offense Guideline | Description | Offense Level Adjustment |
|---|---|---|
| 2B1.1(a) | Base Offense Level | 6 |
| 2B1.1(b)(1)(D) | Loss Amount ($40,000 to $95,000) | +6 |
| 2B1.1(b)(9)(C) | Involved Violation of Administrative Order | +2 |
| 2B1.1(b)(10)(C) | Use of Sophisticated Means | +2 |
| 3C1.1 | Obstruction of Justice | +2 |
| 3E1.1 | Acceptance of Responsibility | -3 |
| | Total: | 15 |

With respect to the loss amount, the PSR is correct that the total loss amount asserted by the government is approximately $43,906, which represents the total amount of money that defendant obtained from criminally illegal charter voyages. This loss figure is extremely conservative for the following reasons:

- It only includes money received from commercial vessel charter activity while an existing COTP order was valid and in effect. Therefore, it does not include money received from Garbowski's 2018 voyages prior to the issuance of the Second COTP Order on July 27, 2018. Arguably, the voyages conducted in 2018 prior to issuance of the Second COTP Order should be

9

included in the loss amount because the Coast Guard rescinded the First COTP Order based upon Garbowski's false statements to the Coast Guard in September 2017 claiming that he would not engage in commercial charter operations. In other words, Garbowski's corrupt act of inducing rescission of the First COTP Order should not inure to his benefit by excluding the early 2018 voyages from the loss calculation.[4] If the income (or attempted income) from those earlier voyages in 2018 contributes to the loss amount, the total loss amount jumps to approximately $76,001. Notably, this change would not affect the loss amount adjustment or the overall guidelines calculation.

- It excludes amounts from any suspected illegal charters where the dollar amount paid cannot be determined or reasonably estimated.

- It excludes amounts Garbowski obtained from illegal charter voyages that Garbowski conducted using another uninspected vessel, which had not been the subject of a COTP order. This is because the COTP orders only precluded him from using the subject vessel to conduct commercial charter voyages.[5]

---

[4] Likewise, Garbowski's financial gain from the July 14, 2018, voyage could conceivably be included because the Coast Guard only allowed that voyage to continue as a result of Garbowski and his passengers falsely claiming that it was not a commercial voyage.

[5] This does not mean that it was lawful for Garbowski to use the other vessel for commercial charters. The other vessel had not been issued a COI – and therefore was not allowed to be operated in commercial service – but it was not the subject of a COTP order.

For the foregoing reasons, this Court may meaningfully apply Guideline § 2B1.1 in the instant case and should therefore sentence Garbowski based upon the application of that guideline.

<u>POSITION PAPER FOR SENTENCING</u>

This Court is obligated to impose a reasonable sentence after consideration of the factors set forth at 18 U.S.C. § 3553(a). In particular, § 3553(a) directs this Court to calculate and consider the advisory guidelines range along with several other factors, including: (i) the nature and circumstances of the offense and the history and characteristics of the defendant; (ii) the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense, afford adequate deterrence to criminal conduct, protect the public from further crimes of the defendant, and provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (iii) the kinds of sentences available; (iv) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (v) the need to provide restitution to any victim of the offense.

The government believes that a custodial sentence within the advisory guidelines range generated by application of Guideline § 2B1.1 is both fair and reasonable under the circumstances. The government believes that a fine of some amount is warranted, particularly given the defendant's employment potential. The

11

government agrees with the proposed supervised release terms and requests that the Court impose a three-year term of supervised release.

With respect to the custodial sentence, the government plans to elaborate further at the sentencing hearing with respect to its position, while briefly addressing below the primary aggravating factors in this case.

A.   Promoting Respect for Law and Deterrence

A sentence within the advisory range of 18 to 24 months' imprisonment is reasonable and appropriate to promote respect for law and ensure deterrence, both specific and general.

The dominant fact permeating the record is Garbowski's persistence in continuing to break the law and tell lies in an effort to get away with it. Despite having been caught "red-handed" operating illegal charter voyages in August 2017, Garbowski doubled-down by lying to the Coast Guard and concealing his continuing illegal conduct, all in a vain and stubborn attempt to avoid compliance with Coast Guard regulations. In particular, he successfully induced the Coast Guard to rescind the First COTP Order by claiming that he would no longer conduct commercial charter operations, only to then brazenly continue conducting illegal charters throughout the 2018 boating season. His attitude at that time is perhaps best reflected in a 2018 text that he sent to a fellow vessel owner about conducting illegal charters, urging that the two of them should "run as pirates" because "nobody gets rich playing by the rules" and "as soon as you apply for the licenses, your [you're] on coast gaurd [guard] radar." In addition to lying to the Coast Guard officials himself,

he repeatedly instructed his charter clients and passengers to lie to the Coast Guard as well. He changed the name of the vessel and kept very few records of his activity. He also changed the language of his standard charter contract to make even more explicit the requirement that the charterer lie if asked by government officials about whether the voyage was commercial in nature.

After issuance of the Second COTP Order in July 2018, Garbowski again refused to stop operating illegally. Indeed, as with the First COTP Order, Garbowski took further steps at concealment in 2019, to include changing the name of the vessel and the attempted transfer of ownership of the vessel into a nominee entity, the sarcastically (if not cynically) named "Lupole LLC." After the Coast Guard spotted him operating on the Lakefront near the beginning of the 2019 boating season, Garbowski responded by requesting a meeting with CGIS agents, during which he again repeatedly lied about his activity.

The defendant's conduct over multiple years cannot be explained away by immaturity, or "heat of the moment" bad judgment. It was deliberate, calculated and entirely recalcitrant. It was bereft of any respect for the Coast Guard and its important safety mission. And it was also entirely unnecessary. On multiple occasions, Coast Guard personnel told Garbowski that the Coast Guard would help Garbowski determine what he needed to do in order to obtain a COI and operate lawfully.[6] In fact, the CGIS case agent, at the time he served the Second COTP Order

---

[6] It is not clear whether the subject vessel would have qualified for a COI because it is unknown whether the hull of the vessel is constructed with fire-retardant resins, which is required in order for a vessel to receive a COI. Assuming that the hull was constructed of

13

on Garbowski in late July 2018, beseeched Garbowski at least three times to take up the Coast Guard's offer of assistance to determine what he needed to do in order to operate lawfully. The Coast Guard's offer of help, of course, was disregarded.

Garbowski's recalcitrance is a strong aggravating factor and weighs in favor of a strict sentence that will personally deter Garbowski from again engaging in similar criminal behavior. Further, the boating community in Chicago is relatively small, and the Coast Guard's activities are widely discussed by the boating community, so a significant sentence in this case might actually deter the conduct of others who may contemplate conducting illegal commercial charter operations. A strict sentence will likewise promote respect for the law by sending a strong message that there are significant consequences for those who choose to violate the law despite having been given every reasonable opportunity to comply with the law.

B.  Nature of the Offense and Risk of Harm

As the government has acknowledged, there is no evidence that Garbowski's conduct resulted in serious bodily injury or property damage. However, that does not mean that his illegal actions did not create substantial risk of harm.

The subject vessel was seized on June 29, 2019, by law enforcement officers and evaluated by a Coast Guard expert, Chief Warrant Officer Corey Maples, who is qualified to analyze vessels to determine whether they qualify for issuance of a COI.[7]

---

fire-retardant resin, the Coast Guard estimates that the cost of bringing the vessel into compliance for a COI would likely have been in the range of $50,000.

[7] CWO Maples will be present at the sentencing hearing to testify should the Court or either party deem it necessary to take his testimony. Unless a significant factual issue arises, the government does not intend to call CWO Maples to testify.

14

As a vessel in commercial service, the subject vessel was found to be deficient in numerous ways, including its failure to satisfy Coast Guard regulations pertaining to navigation equipment, lifesaving equipment, firefighting equipment, and the vessel's machinery and electrical systems. *See* GVO, Attachment H (Vessel Inspection Report). In addition, the bilge area of the vessel was found to contain multiple bilge pumps, indicative (to trained Coast Guard personnel) of a continuous low-level infiltration of water into the bilge, which enhances the risk of flooding while underway. In addition, several engine system batteries were found unsecured in the bilge area, thereby creating a risk that, especially when underway in rough water, those batteries could bounce in the bilge area and damage the integrity of the hull, which also increases the risk of flooding.

If called to testify, CWO Maples would discuss the purpose of the various Coast Guard requirements, all of which are designed to ensure the safety of passengers and crew and, when in the vicinity of other vessels or people, the safety of those individuals as well. The absence of basic lifesaving and firefighting equipment is particularly problematic given that emergencies often do not announce themselves ahead of time. So, the sudden flooding (sinking) or burning of the vessel could become catastrophic without the proper equipment onboard and/or the proper training on how to use it. If one adds to the mix that these voyages often involved the consumption of alcohol by passengers on a severely crowded vessel, particularly during the panic of an emergency event, the risks of harm only multiply.

While it is fortunate that Garbowski never encountered such a catastrophe during his illegal charter activities, those risks did exist, and are a significant aggravating factor in the determining an appropriate sentence.

C.     <u>Personal Characteristics and Continuing Concerns About Defendant's Honesty</u>

Garbowski's personal characteristics are both aggravating and mitigating.

On the mitigating side, Garbowski is intelligent, educated and capable of holding employment – in short, should he choose to follow the law, he has the capacity to be a productive and contributing member of society. There is nothing in his history that is indicative of a general tendency toward violence, and he truthfully admitted to his criminal conduct in this case. All of these are positive and mitigating factors.

However, the government has continuing concerns about Garbowski's general character for truthfulness. Aside from his activity in this case, Garbowski reported to the Probation Officer that he was unemployed from approximately January 2018 through approximately December 2020 and that he used personal savings to support himself during this period, before beginning work as a self-employed construction contractor in December 2020. *See* PSR at ¶¶ 89-91. However, on at least four occasions during the alleged period of unemployment, Garbowski asked this Court for permission to leave the jurisdiction for work purposes. *See* Dkt. Nos. 36 (11/4/19); 45 (1/13/20); 57 (5/29/20); 63 (9/2/20). In addition, text messages seized from Garbowski's phone suggest that he may have been working for a relative's company at various times in 2018 and 2019, and other online information indicates that he was involved with leasing apartments in (at least) 2019. Moreover, Garbowski's

16

current LinkedIn page (as of on or about May 10, 2023) lists his employment as the President of the "GSKI" construction firm from February 2018 through the present:



Notably, consistent with what Garbowski told the Probation Office, the GSKI construction entity was first incorporated in Illinois on or about December 1, 2020.

To be clear, the government believes that, starting in or about February 2018, Garbowski lacked steady employment. Indeed, that was likely a substantial part of his motivation to continue his illegal charter activity. However, he did engage in scattered employment during this period, but he now denies having done so, claiming instead that he was living off of savings. The claim on his LinkedIn page – namely, that he has been the President of the GSKI construction firm since February 2018 – squarely contradicts what Garbowski told the Probation Officer. The government suspects, but cannot confirm, that the LinkedIn page is incorrect, most likely as a result of defendant attempting to "puff" his credentials in the construction industry.

In any event, these inconsistencies about Garbowski's employment history, and particularly his failure to be fully forthcoming with the Probation Officer, are disconcerting, to say the least. The government sincerely hopes that Garbowski will clarify this information in advance of the sentencing hearing. Until he does, they serve as a reminder that the defendant may not have overcome his tendency to be deceitful when it suits his interest. This, of course, presents a recidivism concern.

## CONCLUSION

For all of the foregoing reasons, the government respectfully requests that this Court impose a sentence within the advisory guidelines range of 18 to 24 months' imprisonment, along with other terms as discussed above.

                                        Respectfully submitted,

                                        MORRIS PASQUAL
                                        Acting United States Attorney

By:    *s/ Timothy J. Chapman*_____
       Timothy J. Chapman
       Assistant United States Attorney